William LEWIS, Carolyn Lewis, William Price, Cheryl Price, David McKay, Cindy McKay, Howard Clark, Acquanetta Clark, Frank P. Spadaro, Frances M. Spadaro

v.

REGO COMPANY, the Bastian Blessing Co., in its own right and t/a Rego Company, Astro Controls, Inc., in its own right and t/a Bastian Blessing and Rego Company, the Marmon Group, in its own right and t/a Rego Company.

Appeal of Howard CLARK and Acquanetta Clark, Frank P. Spadaro and Frances M. Spadaro.

No. 84–1335.

United States Court of Appeals, Third Circuit.

Argued Jan. 14, 1985.

Decided March 15, 1985.

*nor*); *Central Transport, Inc. v. U.S.*, 694 F.2d 968 (4th Cir.1982) (*Port Norris, Intervenor*).

Robert A. Sloan, (Argued) Stephen A. Sheller & Associates, Philadelphia, Pa., for appellants.

Joseph E. O'Neil, (Argued) Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for appellee, Rego Company.

Before HUNTER and HIGGIN-BOTHAM, Circuit Judges, and DEBE-VOISE, District Judge *.

## OPINION OF THE COURT

DEBEVOISE, District Judge:

Appellants in this products liability case appeal from a judgment of the district court entered upon a jury verdict in favor of appellee Rego Company. Appellants also challenge the district court's order denying their motion to remand the case to the state court from which it was removed. We conclude that the district court correctly denied the motion to remand, and, therefore, it is necessary to consider the merits of appellants' contention that the district court committed reversible errors in the course of the trial.

### I. *Removal*

Appellants, Howard and Acquanetta Clark, Frank P. and Frances M. Spadero and others, commenced this action in the Court of Common Pleas of Delaware County, Pennsylvania, on or about August 12, 1983. Named as defendants were Rego

---

* Hon. Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation.

Company, The Bastian-Blessing Co., Astro Controls, Inc., and The Marmon Group.[1]

On September 16, 1983, three of the four defendants (Rego, Astro and Marmon) were served, and on September 26 they filed a removal petition in the district court asserting that the action was one over which the district court had original jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship). The fourth defendant, Bastian, did not join in the petition. The petition stated "[t]hat no entry of appearance has yet been made on behalf of The Bastian-Blessing Co." The petition also stated "that upon information and belief The Bastian-Blessing Co., is not now, and was not at the time of the commencement of this action, a citizen of the Commonwealth of Pennsylvania." Bastian was served on October 3, 1983.

On October 28, 1983, plaintiffs moved to remand. On November 9, Bastian's attorney wrote the trial judge stating that "I join in [the other defense attorneys'] Petition for removal to the Federal District Court." On November 10, the attorneys for Rego, Astro and Marmon filed an "Amendment to Petition for Removal" reciting Bastian's consent to and joining in the petition and asserting facts showing that Bastian's presence did not deprive the court of diversity jurisdiction. Thereafter the trial court entered an order stating that "it appearing to the court that at the time the petition for removal was filed all of the defendants which had been served joined the petition, the motion to remand is DENIED. The subsequent joinder or non-joinder of a subsequently served diverse defendant is immaterial."

Appellants urge that the removal petition was defective on its face and consequently did not confer jurisdiction on the district court because: (i) it did not set forth a reason which would justify Bastian's failure to join in the petition; (ii) it did not state affirmatively Bastian's citizenship; and (iii) its allegation that Bastian was *not* a citizen of Pennsylvania was "not stated with certainty but rather 'upon information and belief.'" (Appellants' brief at 10). Further, appellants argue as a general proposition that if all defendants are served within 30 days of service of the first defendant, all must join in the removal petition; here Bastian did not join in the removal petition either within 30 days of service on the first defendants to be served or within 30 days of service upon Bastian.

■ Removal is a statutory right, and the procedures to effect removal must be followed, e.g., *Resident Advisory Board v. Tate*, 329 F.Supp. 427 (E.D.Pa.1971). Here Rego, Astro and Marmon proceeded under 28 U.S.C. § 1446 which provides that "[a] defendant or defendants desiring to remove any civil action ... from a state court shall file in the district court ... a verified petition containing a short and plain statement of the facts which entitled him or them to removal...." Section 1446 has been construed to require that when there is more than one defendant, all must join in the removal petition, *e.g., Northern Illinois Gas Co. v. Airco Indus. Gases*, 676 F.2d 270 (7th Cir.1982).

■ There are exceptions to the rule requiring that all defendants join in the removal petition. One exception arises when a non-resident defendant has not been served at the time the removing defendants file their petition. In that situation the removal petition will be effective provided that it alleges that the defendants who did not join in it were not served in the state proceeding. *DiCesare-Engler Productions, Inc. v. Mainman, Ltd.*, 421 F.Supp. 116 (W.D.Pa.1976).

■ Appellants in the present case argue that the removal petition was defective on its face because it did not allege that Bastian had not been served in the state proceeding. Instead the petition alleged that "no entry of appearance has yet been made on behalf of [Bastian]," leaving open the possibility that Bastian might have been served but simply had not yet entered

---

1. Just prior to trial the plaintiffs other than the appellants named above settled with defendants, and by stipulation of counsel all defendants other than Rego Company were dismissed.

an appearance. We conclude that while it would have been preferable to have alleged non-service, the language of the petition was sufficient to bring it within the non-service exception.[2]

We also conclude that appellants' other objections to the face of the petition are not well taken. The petition alleged that all the plaintiffs were citizens and residents of Pennsylvania. It was sufficient to establish diversity jurisdiction to allege that Bastian was not a citizen of Pennsylvania. This statement was based on information which counsel for the removing defendants obtained from Bastian's representatives when seeking to persuade Bastian to enter an appearance and join in the removal petition. The effectiveness of the removal petition was not vitiated by the fact that in an abundance of caution it charcterized the information about Bastian's citizenship as being based on information and belief.

As noted above, although Bastian had not been served at the time the removal petition was filed, Bastian was served within the 30-day period after service on the other three defendants. Appellants contend that in such circumstances if Bastian did not join in the petition before expiration of the 30-day period, the action should have been remanded. Any other rule, appellants argue, would encourage a race to the courthouse, enabling the defendants first served in a case to determine whether it would be removed.

Appellants cite no authority for the rule they espouse, and we agree with the district court that the removal statute contemplates that once a case has been proper-ly removed the subsequent service of additional defendants who do not specifically consent to removal does not require or permit remand on a plaintiff's motion. The statute itself contemplates that after removal process or service may be completed on defendants who had not been served in the state proceeding. The right which the statute gives to such a defendant to move to remand the case confers no rights upon a plaintiff. 28 U.S.C. § 1448.[3]

Having concluded that the district court's order denying the motion to remand should be affirmed, it is necessary to consider appellants' contention that the trial court committed harmful errors in the course of the trial of the case.

## II. *Asserted Trial Errors*

This is a products liability case arising out of the explosion of a propane cylinder on September 11, 1981 at Sun Ship, Inc., in Chester, Pennsylvania. Appellants' claims against appellee, the manufacturer of the cylinder's safety relief valve, are based on strict liability in tort. Specifically, it is charged that the relief valve was defective in design and was sold without adequate warnings. Appellants advance fourteen grounds for reversal of a judgment on a jury verdict in favor of appellee. We find no merit to most of these grounds but conclude that legal error in the jury charge concerning misuse of the product and the cumulative effect of erroneous rulings relating to a report of one of appellee's experts require reversal and remand for a new trial.

---

**2.** Our holding that the language of the petition meets the requirements of 28 U.S.C. § 1446 makes it unnecessary to decide whether a defective or omitted allegation of non-service can be cured by filing an amendment to the petition more than 30 days after service of the complaint as defendants sought to do here, *cf. Northern Illinois Gas Co. v. Airco Indus. Gases, supra,* which held that a removal petition signed by one of two defendants could be amended after expiration of the 30-day period to explain that the non-joining defendant was a nominal party whose joinder in a removal petition was not necessary.

**3.** In *Hutchins v. Priddy,* 103 F.Supp. 601 (W.D. Mo.1952), the court stated: "When the case removed under [Section 1448] reaches the federal court, process and service thereof may be completed against those defendants not before the court. Any defendant so subsequently served may move to remand the case to the state court, but a plaintiff may not do so if jurisdiction of the United States District Court is established over the action." 103 F.Supp. at 607; *see* 1A Moore's *Federal Practice* ¶ 0.168[3.–5–5] in which the author concludes that "[t]his case reaches a sound result."

## .A. *The Jury Charge*

Applying Pennsylvania law which is applicable in this case, the trial court correctly charged the jury that if it found "that the product at the time it left [appellee's] control lacked any element necessary to make it safe for use or contained any condition that made it unsafe for use, then the product was defective and the [appellee] is liable for the harm caused by such defect." (App. at 873a). The court instructed the jury how to determine if a product was defective. The court further instructed the jury that "[a] supplier must give such warnings and instructions as are required to inform the user or consumer of the possible risk of using the product or which are created by the inherent limitations in the safety of such use. If you find such instructions or warnings were not given, the [appellee] is liable for all harm caused thereby." (App. at 875a). The court fully charged that in addition to proof of a defective product, appellants were required to establish that the defect was the proximate cause of their injuries.

The portion of the charge which appellants contend was not in accordance with Pennsylvania law concerned misuse of the product, reflecting one of appellee's contentions at the trial, namely, that the relief valve had been misused.

There was substantial evidence in the case that the relief valve had in fact been misused through the failure to protect it from injury or deterioration as prescribed by the manufacturer and applicable regulations. The charge concerning misuse was:

> If you find that the product in question was being used in a manner which is not in accordance with its intended use, then your verdict as to the issue of strict liability *must* be in favor of the defendant, and you may find that the product was safe for its intended use even though you may conclude that a safer design was feasible.

(App. at 873a). Appellants objected to this charge.

After retiring to deliberate the jury asked the court to elaborate upon the subject of what makes a product defective. The trial court reviewed the law on the subject for the jury, including a statement to the effect that "if you find that the product in question was not being used in a manner—or was being used in a manner which is not in accord with the intended use of the product, then your verdict on liability should be in favor of the manufacturer." (App. 892a).

Since there was undisputed evidence in the case that employees at Sun Ship did not take the required precautions in protecting safety relief valves, and that they thus misused the product, the trial court's charge might well have been understood by the jury to require it to return a verdict for appellee.

 While under Pennsylvania law misuse of a product is relevant to a number of issues in a strict liability case, misuse, of itself, is not a separate defense. The law on the subject is set forth in *Berkebile v. Brantley Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975).[4] There plaintiff sued on a theory of strict liability charging that the rotor system of a helicopter manufactured by defendant was defective. Defendant asserted that the rotor blade had fractured due to an abnormal use. The trial court charge the jury separately on the issue of "abnormal use," stating, "[t]he defendant is not liable if the product is used in an

---

4. The doubts about the authoritativeness of *Berkebile* which this court expressed in *Bair v. American Motors Corp.*, 535 F.2d 249, 250 (3rd Cir.1976), appear to have been laid to rest in *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978), in which a unanimous court relied upon *Berkebile*. In *Dambacher By Dambacher v. Mallis*, —— Pa.Super. ——, 485 A.2d 408 (1984), the Superior Court stated:

> The precedential authority of *Berkebile* was for a time uncertain, for, as noted, only Justice NIX had joined in the Chief Justice's opinion. This uncertainty, however, was removed by the Supreme Court's decision in *Azzarello*. There the Court, in a unanimous opinion by Justice NIX, cited with approval and adopted the Chief Justice's opinion in *Berkebile*.
> —— Pa.Super. at ——; 485 A.2d at 426.

abnormal manner, or in a way in which it was not designed to be used." The Pennsylvania Supreme Court held that this charge was erroneous.

According to *Berkebile*, in order to establish a strict liability claim a plaintiff need prove only that the product was defective and that the defect was a proximate cause of plaintiff's injuries. Proof of abnormal use of the product may be relevant to the issue of the defect and it may be relevant to the issue of proximate cause. According to the Court, however, "abnormal use" is not properly submitted to the jury as a separate defense. *Id.* at 99, 337 A.2d at 901.

In *Burch v. Sears, Roebuck and Co.*, 320 Pa.Super. 444, 467 A.2d 615 (1983), the court discussed the proper use of evidence of misuse or abnormal use of a product. As to the issue of defectiveness of the product, the court stated:

> ... Because a product is defective only if it is unsafe for its intended use ... a finding of defect *may* be precluded when the plaintiff is injured when using the product in an "abnormal" manner.... An allegedly abnormal use will negate liability, however, only if it was not reasonably foreseeable by the seller.

*Id.* at 451–52, 467 A.2d at 619 (emphasis added). As to the relevance of evidence of misuse to the issue of proximate cause, the court stated:

> ... The related issue of causation is raised when the plaintiff's action is so reckless that the plaintiff would have been injured despite the curing of any alleged defect, or is so extraordinary and unforeseeable as to constitute a superseding cause.

*Id.* at 452, 467 A.2d at 619.

■ In the present case the trial court's instruction to the jury that if it found that the product was being misused its verdict on the issue of strict liability *must* be in favor of the appellee was in conflict with the law set forth in *Berkebile* and *Burch*. The charge raised misuse to the level of a separate defense instead of permitting the jury to consider evidence of misuse as it related to the issues of defectiveness and proximate cause. If it followed this instruction the jury may have found for appellee on the basis of facts which, absent this instruction, would not have produced this result. We conclude, therefore, that the jury instruction on misuse of the product was both erroneous and prejudicial.

### B. *Evidence Rulings Relating to McMahon Report*

In order to understand the evidence rulings to which appellants take exception, it is necessary to set forth some of the parties' proofs and contentions.

The product involved was a safety relief valve which was designed to be placed on top of a propane cylinder. When pressure within the cylinder built up to 375 pounds per square inch, the valve was designed to open, relieving the pressure inside the cylinder. The cylinder was supposed to be filled to within 4″ from the top, not higher.

In the company of Commander Morton, an engineer, Dr. Charles McMahon, a metallurgist, examined the ruptured cylinder several days after the accident for the purpose of determining the cause of the rupture. He and Commander Morton were informed of the weather and temperature of the cylinder. The temperature of the cylinder determined its internal pressure. Dr. McMahon concluded that "[t]he failure of the cylinder was the direct result of the presence of a defective longitudinal weld [in the cylinder.]" He further concluded that "[t]he estimated pressure in the cylinder was well within the rated service pressure and the specified setting of the pressure relief valve." (Exh. D–3 *id.*). In arriving at this conclusion Dr. McMahon relied upon information given to him that the cylinder had been properly filled and that there was a space filled with vapor between the liquid and the top of the cylinder.

Subsequently, Commander Henry Morton, the engineer who had accompanied Dr. McMahon when he examined the site and the cylinder, tested the safety relief valve which had been on the cylinder when it

ruptured. He sought to ascertain at what pressure the valve would lift. Although the valve was designed to lift at 375 pounds per square inch, it did not rise when up to 600 pounds of pressure was applied, the maximum pressure which the testing machine could produce without stripping the valve.

Thus the conclusion in Dr. McMahon's report that the pressure within the cylinder was within the specified setting of the valve was critical. If he was correct, the fact that the valve was not functioning properly could not be said to have caused the accident because the cylinder ruptured before the internal pressure reached the point when the valve was supposed to have been activated.

However, it appears that Dr. McMahon's conclusion that the pressure was within the specified valve setting may have been based upon a faulty assumption. He assumed that space filled with vapor separated the liquid in the cylinder from the top of the cylinder. In fact there was substantial evidence that the cylinder was filled to the top with liquid. In that situation, given the same cylinder temperature, the pressure inside the cylinder would have been significantly greater than Dr. McMahon's estimate. In Commander Morton's words, "[w]hen you abolish the vapor space, then you are in trouble." (App. at 193a).

The parties appear to be in agreement that the cylinder had been overfilled, this being one example of misuse to which appellee refers. (App. at 853a). Appellee's expert accepted the fact that on the occasion in question the cylinder was stressed with no vapor space inside it. (App. at 722a). Apparently after preparation of his original report Dr. McMahon was advised that the cylinder had been overfilled with liquid, and upon the basis of this new information he withdrew from his opinion that the defective weld had caused the rupture.

Appellee was aware at the time of the trial that Dr. McMahon had abandoned his key conclusion. Notwithstanding this knowledge, it raised the subject of Dr. McMahon's report during cross-examination of Commander Morton in such a manner that the jury was left with the impression that Dr. McMahon was of the opinion that the failure of the cylinder was caused by the defective weld. The court's rulings prevented appellant from correcting this erroneous and highly prejudicial impression.

Appellant called Commander Morton to testify concerning his inspection of the vessel on which the explosion occurred and his examination of the parts of the cylinder which he saw. He identified diagrams and photographs of the scene. He also described the procedures for conducting and the results of the tests which determined that the safety relief valve would not lift under pressure up to 600 pounds per square inch. At no time did appellant ask Commander Morton his opinion about the cause of the rupture.

On cross-examination appellee brought out that Commander Morton had inspected the site of the explosion with Dr. McMahon. Although appellants had asked Commander Morton only concerning what he observed and did, appellee, over appellants' objection, was permitted to ask him his opinion about what had made the cylinder burst. In response Commander Morton testified that he had concluded that the rupture was caused by a defective weld in the cylinder wall, and that the McMahon report confirmed his views. Appellee asked Commander Morton about Dr. McMahon's expertise and procedures when testing the cylinder fragments and then showed him a copy of the McMahon report. Commander Morton agreed in response to appellee's questioning that the report was the type of information he would rely on in his engineering practice. During colloquy in front of the jury arising from appellants' objections to this line of questioning the trial court declined to permit the witness to state whether the report came to a conclusion whether the weld was defective. The reason the court gave for its ruling was that "[t]he witness said it earlier. He said that's one of the reasons he got Dr. McMahon to confirm his conclusion. So the ques-

tion is already answered, so I'll sustain the objection." (App. at 182a).

On redirect examination Commander Morton testified that he had not talked with Dr. McMahon since the date of his report and that if he learned that Dr. McMahon had changed his findings and conclusions in certain respects, "[i]t might alter [my opinion] considerably." (App. at 188a). Further, Commander Morton testified that his opinion was based on the assumption that the cylinder had been properly filled and that if the cylinder had been completely filled with liquid the pressure would have been considerably greater than stated in his cross-examination.

We conclude that the effect, if not the purpose, of appellee's cross-examination of Commander Morton was to place before the jury the opinion contained in Dr. McMahon's report. This was hearsay evidence and even under ordinary circumstances it would not have been proper to admit it. In this case in which it appears that unbeknownst to the witness Dr. McMahon had repudiated his opinion concerning the cause of the rupture, it was particularly prejudicial to admit testimony about the report.

Appellee urges that allowing inquiry into the McMahon report was within the court's discretion. Under Fed.R.Evid. 611(b) a court in the exercise of its discretion may permit inquiry into subject matters outside the direct examination "as if on direct examination." Generally the proper bounds of cross-examination are within the sound discretion of the trial court and, absent a showing of abuse, the exercise of that discretion will not be reversed by an appellate court. *Goehring v. Diamond Milling Co.,* 461 F.2d 77 (3d Cir.1972).

▇ Under the circumstances of this case it was an abuse of discretion to permit cross-examination of Commander Morton about his opinion of the cause of the cylinder rupture. Even though his experience as an engineer permitted him to make highly informed observations and to conduct the tests of the safety relief valve, his testimony was essentially factual in nature. He was not asked on direct examination about the cause of the cylinder rupture. It was prejudicial error to permit appellee on cross-examination to ask him his opinion on this subject. His opinion, as appellee knew very well, was based on a report which had been withdrawn in that respect. To compound the prejudice, appellee was not only allowed to ask the question which should not have been asked, under the guise of asking the witness about the basis for his opinion appellee was able to bring the repudiated portion of the McMahon report to the jury's attention.

A different kind of error was committed during the course of Dr. Leonard's testimony. Appellant called Dr. Leonard, an expert in physical metallurgy, to give his opinion that although the cylinder weld was defective, the cause of the rupture was the inoperative safety relief valve. Both on direct and redirect examination appellant elicited from Dr. Leonard testimony that generally when forming professional opinions he relies in part on discussions with colleagues with similar technical backgrounds. In this case he reviewed, among other things, the December 1981 McMahon report and he also had discussions with Dr. McMahon in the summer of 1983 concerning the cause of the rupture of the cylinder. On the basis of his own studies Dr. Leonard agreed in large measure with the original McMahon report's conclusion that the cylinder was defective. On the basis of his own studies and his 1983 conversation with Dr. McMahon he concluded that the rupture was not caused by the defective cylinder weld; rather it was caused by the failure of the valve to function properly.

After eliciting from Dr. Leonard that he had discussed the cause of the rupture of the tank with Dr. McMahon, appellant asked him: "Dr. Leonard, at the end of that discussion, was there any agreement as to whether your opinion or Dr. McMahon's opinion was a correct opinion?" (App. at 373a). It was expected that Dr. Leonard would testify that Dr. McMahon had changed his view concerning the cause of the rupture upon learning that the cylinder had been overfilled with liquid. The

trial court sustained appellee's objection to the question.

 A lay witness' conversation with Dr. McMahon would not have been admissible in evidence. However, since Dr. Leonard's conversation with Dr. McMahon was the kind of material on which experts in the field base their opinions, inquiry concerning the conversation should have been permitted. Fed.R.Evid. 703; *Indian Coffee Corp. v. The Proctor & Gamble Company,* 752 F.2d 891 (3d Cir.1985). Although it is not required that the bases for experts' opinions be disclosed before an opinion is given, the bases of an opinion may be testified to on direct examination and, if inquired into on cross-examination, must be disclosed. Fed.R.Evid. 705. There is no apparent reason why the trial court precluded appellant from fully developing this basis for Dr. Leonard's opinion.

The case presents an anomalous situation unfairly prejudicing appellants. Appellants called Commander Morton as a fact witness. Over objection the court permitted appellee on cross-examination to elicit the witness' expert opinion that a defective cylinder weld caused the explosion. The court then permitted the witness to testify that he relied on Dr. McMahon's report and that the report agreed with his conclusion. Yet when appellants called Dr. Leonard as an expert witness to elicit his opinion that the safety relief valve caused the explosion the trial court refused to allow him to testify that he relied on discussions with Dr. McMahon and that in these discussions Dr. McMahon modified his earlier conclusions concerning the cause of the explosion.

Under the Rules of Evidence Dr. Leonard could have been examined fully both on direct and cross-examination concerning the bases of his opinion. The bases of his opinion included the McMahon report and Dr. McMahon's subsequent modification of his conclusions resulting from additional information supplied him. This would not have justified appellee questioning Commander Morton about his opinion concerning the rupture. The question was impermissible as beyond the scope of the direct examination, and appellee knew that this opinion was given without Commander Morton being aware of Dr. McMahon's change of view. However, had the trial court allowed full examination of Dr. Leonard concerning his discussions with Dr. McMahon the prejudice resulting from the testimony of Commander Morton might well have been overcome. However that was not done, and the prejudicial effect of the two sets of evidential rulings was never ameliorated by disclosure to the jury of the totality of Dr. McMahon's opinion concerning causation.

For the foregoing reasons we will vacate the order of the district court entering judgment for defendant on the jury verdict and remand for a new trial.