**STATE of Iowa, Appellee,**

v.

**Bryan Kirby BARRETT, Appellant.**

No. 87–1325.

Supreme Court of Iowa.

Aug. 16, 1989.

Rehearing Denied Sept. 15, 1989.

750

Thomas J. Miller, Atty. Gen., Ann E. Brenden, Asst. Atty. Gen., and James W. Ramey, III, Sp. Prosecutor, for appellee.

Lylea Dodson Critelli of Nick Critelli Associates, P.C., Des Moines, for appellant.

HARRIS, Justice.

In *State v. Barrett*, 401 N.W.2d 184 (Iowa 1987), we reversed defendant's convictions of two murders and remanded for a new trial. Following remand, defendant was retried and again convicted on both murder charges. He brought this appeal assigning numerous errors in his second trial. The court of appeals, being equally divided, affirmed his convictions by operation of law. We affirm.

The facts are most bizarre. For the most part they will not be repeated, having been detailed in our opinion on the first appeal. The bodies of two young women, Cynthia Walker and Carol Willits, were found several miles apart along a rural Muscatine County road. The circumstances made it appear, as defendant insists, that Ms. Willits had committed suicide after murdering Ms. Walker. The State's theory was that defendant murdered Walker to obtain life insurance benefits and thereafter murdered Willits in such a way to suggest the murder-suicide theory espoused by the defendant.

I. A number of assignments challenge discretionary trial court rulings. Owing to a trial court's superior vantage point at trial, certain trial court determinations are placed initially within that court's province. They will not be disturbed on appeal unless we determine the trial court's discretion was abused. Abuse exists only when the discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *State v. Pappas*, 337 N.W.2d 490, 493 (Iowa 1983).

II. One challenged discretionary ruling allowed testimony by an expert witness for

the State. Vincent DiMaio, a physician and forensic pathologist, is the chief medical examiner and director of the regional crime laboratory for Bexar County (San Antonio), Texas. He testified extensively concerning his conclusion that Carol Willits did not commit suicide but was murdered.

The challenged testimony came during Dr. DiMaio's redirect testimony. He testified it was common practice for forensic pathologists to discuss cases when coming to professional conclusions. The witness was then asked whether he "found any of your colleagues who have given you persuasive reason to disregard your opinion that this was a homicide as opposed to a suicide in the death of Carol Willits?" Over the defendant's hearsay objection, the trial court allowed the witness to state that, no, his colleagues had not caused him to change his opinion.

In *State v. Judkins*, 242 N.W.2d 266 (Iowa 1976), the trial court allowed an expert witness to testify that his opinion was confirmed by a handwriting expert. We disapproved the testimony, finding it was indirect or obscured hearsay. *Id.* at 267.

Since our *Judkins* holding we adopted the Iowa rules of evidence. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Other states, interpreting a similar rule, have allowed testimony not unlike that challenged here.

A very similar challenge was at issue in *State v. Jones*, 322 N.C. 406, 368 S.E.2d 844, 846 (1988). A fingerprint expert testified regarding an office quality control system whereby identifications were verified by a second examiner before the report could be mailed out. *Id.* The court held this testimony was properly admitted as part of the basis for the expert's opinion. *Id.* Federal courts also follow this rule.

*See Lewis v. Rego Co.*, 757 F.2d 66, 73 (3d Cir.1985) (discussions with colleagues admissible as kind of material on which experts base their opinions); *United States v. Posey*, 647 F.2d 1048, 1051 (10th Cir.1981) (chemist allowed to testify regarding review of other chemist's analysis); *American Universal Ins. Co. v. Falzone*, 644 F.2d 65, 66 (1st Cir.1981) (fire marshal allowed to testify on opinion as to cause of fire based in part on reports of other investigators).

We have a liberal tradition in the admission of opinion testimony. *See State v. Halstead*, 362 N.W.2d 504, 506 (Iowa 1985). The liberal tendency is evident in the adoption of the rule of evidence 703. We are, however, inclined to disapprove this challenged testimony.

■■■ Rule of evidence 703 does not go so far as to completely overrule our holding in *Judkins*. It does not empower one expert witness to state other experts also subscribe to the witness's stated conclusion. Additional foundation testimony, missing here, would be required in order for this testimony to be admissible under rule 703. To form a basis for admitting the challenged statement it would first be necessary to show that the opinion of his colleagues was the type of "fact or data" reasonably relied upon by experts in the field in reaching their conclusions.

■ The usual facts or data, under the rule, would ordinarily be lab or other test results, charts, texts, etc. We agree with defendant's challenge to the testimony, but defer for now considering whether it amounts to abuse requiring a reversal.

■ III. We find no abuse in another evidentiary ruling. Although defendant did not testify the record revealed that defendant told the police he had a sexual relationship with Ms. Willits. A prosecution witness who was a friend of Carol Willits later testified of her good character and her relationship with defendant. She stated Ms. Willits had firm convictions against premarital sex. On redirect examination the prosecutor asked the witness what she would think if defendant said he

had sex with Carol as early as December of 1978. The defense objected to the question on the ground of hearsay, that it was speculative and self-serving, and it improperly asked the witness to express an opinion on the credibility and truthfulness of defendant. After the court overruled the objection the witness answered that she "wouldn't believe that to be true."

Barrett contends the trial court erred in admitting this testimony because the credibility of the witnesses or parties to a lawsuit is within the sole province of the fact finder. He cites *State v. Myers*, 382 N.W.2d 91 (Iowa 1986). The case has no application to the facts here.

*Myers* involved expert opinion testimony on the credibility of a complaining witness who was a child and allegedly the victim of sexual abuse. *Id.* at 97. The testimony here, by a layperson, did not so much address defendant's credibility as it stated an opinion about Carol Willits' character and behavior. Indeed the witness told the jury she scarcely knew defendant and had only met him a couple of times.

■ IV. As in defendant's first trial, the State relied heavily on a journal written by defendant in 1977, in which he described a plot to kill his wife. In the journal defendant related a plan, later abandoned, to kill his wife in order to recover life insurance proceeds. Because of the similarity between that plan and the State's theory in the killings here, the State contends the journal was admissible to establish a pattern of behavior. In defendant's first appeal we agreed the journal was admissible to demonstrate motive under Iowa rule of evidence 404(b).

Defendant however contends the foundation for admitting the journal was not established on the retrial. In preparing for the second trial defendant took special note of the language in our first opinion relating to admitting the journal:

> . . . the somewhat irregular circumstances surrounding defendant's actions in obtaining insurance on the life of his estranged wife approximately two years earlier. . . .

*Barrett*, 401 N.W.2d at 188. Accordingly, at his second trial, defendant more fully explored the events surrounding his purchase of his wife's life insurance policy. He contends it was bought after she had lost her job and, because it was an employment benefit, also had lost her life insurance. Defendant thinks this showing dissipated any sinister implications which may have been associated with the wife's insurance policy.

We think defendant's additional testimony does not destroy the foundation for the journal. Defendant's new explanations for his wife's life insurance do not preclude the possibility that a later malicious motive took hold. The new explanations go only to the weight the jury should accord the journal, not to its admissibility. There was no abuse in admitting the journal.

V. Defendant's first trial took place in Muscatine County. On remand following our earlier opinion he moved for and was granted a change of venue to Cedar County, where this trial was held. Asserting that pretrial publicity would also deny him a fair trial in Cedar County, defendant moved for a second change of venue. This request was denied and defendant cites the denial as a separate assignment of error.

■ A defendant who seeks a reversal on such a basis must show either actual prejudice on the part of the jury or must show that the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed. *State v. Spargo*, 364 N.W.2d 203, 207 (Iowa 1985). Our review is de novo; we reverse only if the trial court abused its discretion in denying the motion. *Id.*

Barrett argues his case is similar to *State v. Robinson*, 389 N.W.2d 401 (Iowa 1986), and should likewise be reversed. In *Robinson* we found:

> Nearly everyone on the jury panel had heard or read about the case and many were acquainted with the prosecution witnesses. . . . All panel members except one knew something about the case

and ten of the first sixteen questioned had already formed an opinion.

*Id.* at 403.

■ The facts here do not square with *Robinson.* Fifteen members of this panel had heard nothing at all of the case. Only two prospective jurors stated they could not set aside their knowledge of the case and reach their verdict on the basis of the facts heard at trial. These two were struck for cause. No one on the panel knew any of the parties or witnesses.

The facts here more closely resemble those in *State v. Gavin,* 360 N.W.2d 817 (Iowa 1985), which also involved a retrial following reversal. Venue for the retrial was changed from Scott to Cedar County. Notwithstanding extensive pretrial publicity we found no abuse in the trial court's refusal to grant a second change. We said:

> Impartiality does not mean complete juror ignorance of issues and events. The mere fact that a juror has been exposed to information concerning the case does not justify the conclusion that the juror is prejudiced. For the purpose of determining juror prejudice, the relevant question is not what a juror has been exposed to, but whether the juror holds such a fixed opinion of the merits of the case that he or she cannot judge impartially the guilt or innocence of the defendant.

*Id.* at 819 (citations omitted).

■ Defendant urges that the court erred in not moving the case to Jackson County. He produced a survey which, he contends, shows it to be the county in his district with the least amount of prejudice. Our system however does not accord the defendant the privilege of designating the county to which venue is to be moved. *Harnack v. District Court of Woodbury County,* 179 N.W.2d 356, 360 (Iowa 1970) ("A defendant on motion for change of venue does not have a right to select a particular county for his trial.").

The trial court did not abuse its discretion in denying the motion for a second change of venue.

■ VI. Defendant challenged nine prospective jurors for cause. Two chal-lenges were sustained. Seven challenges were denied and the denials are assigned as error. Each challenged juror indicated some outside knowledge of the case but, upon examination by the court, expressed an ability and willingness to set aside any prior knowledge pending the trial evidence.

Defendant contends the court's further inquiry violated the rule in *State v. Beckwith,* 242 Iowa 228, 236–38, 46 N.W.2d 20, 24–26 (1951). In *Beckwith* the trial court's persistent questioning resulted in the jurors' retreating from their initial answers. The record is completely unlike the one in *Beckwith.* The court's inquiry here was not aimed at persuading a juror to compromise a valid concern about disqualification for cause. The judge here was obviously bent only on learning the jurors' state of mind.

Under the three-factor analysis explained in *State v. Williams,* 285 N.W.2d 248, 267 (Iowa 1979), we find no abuse.

■ Neither do we find abuse in the trial court's denial of defendant's motion to sever the two murder charges for separate trials under Iowa rule of criminal procedure 6(1). *See State v. Lam,* 391 N.W.2d 245, 249 (Iowa 1986).

■ VII. Defendant thinks the trial court abused its discretion in not granting a mistrial because of prosecutorial misconduct. To prevail on this assignment defendant must show both the misconduct and that he was prejudiced by it. *State v. Ruble,* 372 N.W.2d 216, 218 (Iowa 1985). It is also a discretionary ruling. *Id.*

Although some of the matters of which defendant complains are not commendable, we cannot say the court abused its discretion in determining defendant was not prejudiced by them.

■ VIII. Defendant contends there was insufficient evidence to support his conviction. Of course we review all evidence in the light most favorable to the verdict and, because of the verdict, give the State benefit of all reasonable inferences which arise from the evidence. A verdict is binding on us if there is substantial evidence to support it. Substantial evidence

means evidence which could convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *State v. Thompson,* 326 N.W.2d 335, 337 (Iowa 1982).

■ As can be seen from the facts as related in our opinion on the first appeal, this is a most perplexing case. This is necessarily so because the question comes down to whether the defendant is an innocent bystander of a murder and suicide or is a murderer who devised a clever way to make his crime appear to be a murder and suicide.

The facts argued by defendant, however, go only to supporting his theory of the case. They do not detract from the sufficiency of the State's case. Although it could have done so, the jury was not bound to accept defendant's theory. There was also ample evidence from which a rational jury could find all the elements of defendant's guilt for both murders.

■ IX. We have reviewed these and all defendant's arguments and contentions and, with the one exception mentioned in division II, find them without merit. It remains for us to determine whether the admission of the one answer to one question by one witness in the second protracted and complicated trial requires a reversal.

The rule is that:
...the admission of hearsay evidence over a proper objection is presumed to be prejudicial error unless the contrary is affirmatively established. The contrary is established when the record shows that the challenged evidence did not impact on the jury's finding of guilt.

*State v. Nims,* 357 N.W.2d 608, 609 (Iowa 1984) (citations omitted).

Defendant argues the expert's answer—that his conclusion was endorsed by other of his unnamed colleagues—was damaging to his case. He points out that the key factual issue was whether Carol Willits was murdered or committed suicide. This was the central subject of the expert's testimony. Defendant produced three expert witnesses to dispute the opinion of Dr. Di-Maio. The defendant complains that the State, by the challenged testimony, was able to counter his array of expert witnesses before the jury without producing them for cross-examination.

We are however convinced the statement did not impact on the jury's verdict. In the first place any chance the jury was swayed by the statement seems most remote. The fact that the witness's unnamed close professional colleagues where he worked agreed with him is not surprising. The jury likely would be more impressed if the witness had claimed endorsement by independent experts.

■ This was a second trial. Two juries have unanimously agreed on defendant's guilt. That fact is of some significance in evaluating the possibility of prejudice. *See State v. Burris,* 198 Iowa 1156, 1181, 198 N.W. 82, 92 (1924); *State v. Cross,* 12 Iowa 66, 68 (1861).

Defendant was superbly represented at trial and on appeal. He received a fair, if not absolutely perfect, trial. He is not entitled to a third one.

AFFIRMED.

All Justices concur except SCHULTZ, CARTER and LAVORATO, JJ., who dissent.

LAVORATO, Justice (dissenting).

I dissent to division IX.

As the majority points out,
the admission of hearsay evidence over a proper objection is presumed to be prejudicial error unless the contrary is affirmatively established. The contrary is established when the record shows that the challenged evidence did not impact on the jury's finding of guilt.

In my view of the record, the majority turns this rule on its head. Far from affirmatively establishing that Dr. DiMaio's hearsay response did not impact on the jury's finding of guilt, I think the record establishes the opposite.

A proper analysis of the prejudice issue necessarily requires an examination of the facts, an explanation of the theories of

both sides coupled with a determination of which theory the facts best support, an evaluation of the importance of the experts and their testimony, and the setting in which the hearsay response was solicited.

As the majority notes, the facts are indeed bizarre. They involve the deaths of two young women: Cynthia Walker and Carol Willits.

On February 23, 1979, Walker's body was found on a road in Muscatine. She had been shot three times.

Several miles away, Willits' body was found in her vehicle with the engine running. She had a single gunshot wound to her right temple. The wound was inflicted by a gun found in her lap—the same gun that had been used to kill Walker. Willits had purchased the gun forty-eight hours earlier.

Murder-homicide was the investigating authorities' initial theory—the same theory the defense used at trial. A "Dear Jane" letter from Barrett to Willits was found in her vehicle in addition to a valentine from Walker to Barrett.

Barrett told the authorities that he had known both women for several months, that he had been romantically involved with both women, and that he had had sexual relation with Willits. He gave the following account of the events leading up to the deaths of the two women. On February 16 he spent the night with Walker in his home. About 2 a.m. Willits came to the home and caught the couple in bed. An argument then ensued. Willits during this time made threats of suicide. Because of what happened on February 16, Barrett wrote the "Dear Jane" letter severing their relationship.

Walker's mother testified that on February 22, 1979, Cynthia received a phone call from Willits, who made arrangements to pick up Cynthia so the two of them could travel to Iowa City to meet a mutual friend. Cigarette butts of the type of cigarettes Cynthia smoked were found in the ash tray of Willits' vehicle. In addition, hairs were recovered from Willits' vehicle similar to the hairs of both women. Sand found on the bumper of Willits' vehicle was compared to and found similar to sand found at the scene where Walker's body was discovered. Sand in Willits' shoes was similar to sand found in Walker's shoes. Walker died between 10 p.m. and 1 a.m. Willits' died between 10:30 p.m. and 1 a.m.

The State advanced the following theory: Barrett murdered Walker to obtain the benefits of an insurance policy on her life; he then murdered Willits in such a way as to make it appear that Willits had killed Walker and then committed suicide. Necessarily, it was crucial for the State to disprove that Willits' death was a suicide. Hence, a good share of the State's evidence focused on this part of its case.

As to the insurance theory, the jury could have found the following facts. Barrett had been involved in a relationship with Walker prior to her death. In the latter part of 1978 he promised she could ride with him to California. As a condition of the trip, the two were to take out an insurance policy on Walker's life. Although Barrett did not take Walker on the trip, the insurance was nevertheless purchased. The insurance policy was for $50,-000 and had a double indemnity clause providing for double recovery if Walker died a nonnatural death. Barrett was the sole beneficiary of the policy, which was in effect at the time of Walker's death.

Critical to the State's theory was a journal written by Barrett in 1977, which is the subject of division IV of the majority's opinion. As the majority notes, in the journal Barrett related a plan to kill his then wife so that he could recover life insurance proceeds. Although the plan was never carried out, the State introduced the journal to establish a pattern of behavior. Simply put, the theory was that if he could plan it then, he could do it now.

Barrett attempted to discount the relevancy of the journal by showing that he purchased the policy after his wife had lost her job. Because she had lost her job she had also lost her life insurance, which was an employment benefit.

The State offered testimony from Willits' friends to rebut Barrett's claim that he had

had a romantic relationship with her and that he had had sexual relations with her. The State produced some evidence tending to rebut Barrett's story about the confrontation on February 16 and some evidence from which the jury could possibly have found that the gun had been purchased at Barrett's request.

The State produced no direct evidence that Barrett was at the scene of either death. It did, however, produce two witnesses who had seen two cars on the road where Walker died at about 12 a.m. and 12:30 a.m. of the morning in question. One car was a Ford Grenada, the model Willits drove. The other car had rectangular headlights, similar to the Buick automobile belonging to Barrett's parents.

Absent the testimony of the experts, the case was very close. Given the State's burden of proof, however, I think a jury would be hard pressed to say that the evidence, at this juncture, better tended to support the State's theory for conviction of murder. In light of this evaluation, it becomes clear that the testimony of the experts was extremely crucial.

The State produced one expert, Dr. DiMaio, to negate the defense's theory of murder-suicide. Dr. DiMaio, the Chief Medical Examiner and Director of the Regional Crime Laboratory for Bexor County, Texas, had had considerable experience with suicides. He had been employed as a forensic pathologist since 1969. The State had asked DiMaio to review photographs of the scene, the autopsy reports, and the police investigative reports, and to determine whether Willits' death was a homicide or a suicide. His opinion was that her death was a homicide.

DiMaio listed six factors he found significant in reaching his conclusion. The first factor involved the blindfold found around Willits' eyes. In his experience, he had seen no suicide in which a blindfold was used. He thought it would be possible but rare.

The second factor related to the location of the knot in the blindfold. The knot was on the left side of the head. According to DiMaio, a right-handed person, as Willits was, would tie the knot either in the center of the head or more to the right because it is easier using the right hand to tie the knot.

Photographs of Willits' body showed she was wearing cotton work gloves that were obviously too big for her hands, the third significant factor. In DiMaio's opinion, one could not tie a knot with these gloves on.

Photographs also showed that Willits' gun hand was down with the gun on top of it. In DiMaio's opinion, the recoil of the gun would have twisted the gun hand to the right. Typically, in his experience, the gun is found on the seat next to suicide victims or clutched in their hands.

The position of the gun barrel at a straight angle to the temple and the straight path of the bullet through the head were also significant to DiMaio. In his opinion it would be physically difficult if not impossible to shoot oneself in this manner. In his experience, people shoot themselves by canting or angling the gun.

The photographs also showed a paper bag under Willits' arm. It was still intact, opened, and expanded. According to DiMaio, had the gun fallen it would have crushed the bag.

The defense counsel vigorously cross-examined DiMaio with the intention of discrediting his opinion and securing concessions. Counsel brought out the fact that DiMaio had reached his conclusion on the very day the authorities first contacted him.

In addition, counsel was able to secure some concessions that were rather helpful to the defense. For example, it was conceded that the number two cause of death among young people is suicide; that most suicide victims shoot themselves in the right temple; that in twenty to twenty-five percent of the cases, suicide notes are left near the scene; that the notes, as in this case, are generally brief, one page or less; that such notes are usually written within hours of the suicide; that there was no sign of a struggle at the scene in the present case; that the blindfold here does not rule out suicide; and that the forensic

experts employed by the defense were known to DiMaio and were competent.

Turning his attention to some of the six factors listed as significant by DiMaio, counsel also secured some concessions here. For example, DiMaio admitted that it would be easy for someone who is blindfolded to lean forward, cock the head, and shoot. DiMaio admitted there was no physical evidence to refute this possibility. He also admitted that although he had not seen suicides in which a blindfold had been used, it can and has occasionally happened. He further conceded that Willits, sitting in her automobile, could have lowered her left elbow to avoid hitting the car window and tied the knot in that position. Had that happened the knot would have been on the left side of the head.

DiMaio, in response to defense counsel's questioning, admitted that in a deposition prior to trial, he had said that the fact Willits purchased the gun alone less than forty-eight hours before her death suggested suicide. He also admitted that the angle of the bullet was consistent with suicide. Finally, he admitted that a gun held against the head by a suicide victim would cause a wound identical to one held at the same spot by a perpetrator.

Defense counsel brought out the fact that Willits had told her roommate that if she were to do something terribly wrong, she would commit suicide and use a blindfold around her head. DiMaio conceded he could not remember whether he had this piece of information when he first rendered his opinion to the authorities.

Against this background, the prosecutor began his redirect with an attempt to rehabilitate DiMaio. After several questions and answers, the examiner attempted to bolster DiMaio's opinion with the objectionable hearsay:

> Q. I think you mentioned to me you have three or four fellows in your office, other pathologists. You like to have somebody to be able to argue your cases with, don't you? A. Right, if you're by yourself, after a while you develop this God complex. You don't only talk to yourself, you begin to believe you know

everything. It's nice to have other people who say, no, you don't know what you're talking about and argue with you because it makes you think, and one of the dangers of a one-man office is, again, you get this God complex, and that's why you like to have people to tell you you don't know what you're talking about and argue with you.

> Q. You've got that in your organization?
> A. Oh, definitely, yes.
> Q. You don't allow the God complex, to say it—A. No, believe me.
> Q. Doctor, have you in fact almost always or—I guess always worked in a situation where you've worked with other forensic pathologists, you've debated and discussed your cases? A. I've always worked, yes, sir, in offices with multiple medical examiners.
> Q. Have you, in fact, had other colleagues of yours whom you respect in the field of forensic pathology discuss this particular case with you? Have you gone over this with others? A. Yes, sir.
> Q. What sort of comments do you get from them?
> DEFENSE COUNSEL: Excuse me. That calls for hearsay, your Honor.
> Q. Are these the sorts of things you rely upon in your medical practice, Doctor? A. I listen to them, yes.
> Q. And they are the sorts—these are the individuals—other individuals to whom you give credence and credibility when you make opinions and defend or argue your opinions? A. Yes, sir.
> Q. What have you received by way of comment from those types of persons?
> DEFENSE COUNSEL: That calls for hearsay, your Honor, with respect to this matter; objected to for that reason.
> PROSECUTOR: It's an exception for the reason that it's the type of comment that the Doctor has indicated that in his field is relied upon.
> DEFENSE COUNSEL: It doesn't matter to me, the exception is that's hearsay and objected for that reason.
> . . . .

THE COURT: Your response, Mr. Ramey, for the record.

PROSECUTOR: My response was simply that, yes, your Honor, it's hearsay but it's the type of hearsay that has an exception under the hearsay rules. It also has the exception contained within the opinion rule of the Iowa rules of evidence and the federal rules of evidence.

DEFENSE COUNSEL: Your Honor, as a matter—May I make further record?

THE COURT: Please.

DEFENSE COUNSEL: It's also calling for this witness to express opinions of other persons that were not relied upon to make the judgment that he made on the 29th day of November of 1979. It's objected to for that reason as well. It doesn't have any probative value as it relates to this matter.

THE COURT: The objection's overruled.

Q. Doctor, I'm not worried about your opinion in November of 1979. You have continued to discuss this case with colleagues since that time, have you not? A. Yes, sir.

Q. And in discussing this case with your fellow colleagues in the areas of forensic medicine, forensic pathology, have you detailed to them the facts that you've discussed here in front of this jury? A. Yes, sir.

Q. In fact, I believe you also have on occasion discussed with them the so-called suicide note, the note that was found on the dash? A. Yes, sir.

Q. And in that respect, have you found any of your colleagues who have given you persuasive reason to disregard your opinion that this is a homicide as opposed to a suicide in the death of Carol Willits?

DEFENSE COUNSEL: Excuse me. That's objected to for the reasons already articulated. That calls for hearsay on the part of this witness.

THE COURT: Objection overruled.

A. No, sir.

The defendant's three experts also testified to their considerable experiences with suicide. One was a forensic scientist, another a medical doctor, and the third a forensic pathologist. The thrust of their testimony was directed at discrediting the six factors relied on by DiMaio. They also discussed the various items of physical evidence, which, in their views, were consistent with their opinions that Willits' death was the result of suicide.

Whether Willits' death was the result of suicide or murder depended in large measure on the testimony of these experts. The prosecutor's redirect examination of DiMaio was an obvious attempt to shore up his testimony. Skillful cross-examination had done its damage. Perhaps the prosecutor, anticipating damaging testimony from defense experts who were waiting in the wings, was attempting to even up the odds. Doing so by soliciting hearsay testimony concerning opinions of other experts had, I think, its intended effect. The evil in such a procedure, of course, lay in the defendant's inability to challenge these opinions through cross-examination. In my view, such unchallenged opinions on a critical issue served to tip the scales in favor of the State in a case that was obviously close.

I would reverse and remand for a new trial.

SCHULTZ and CARTER, JJ., joins this dissent.