United States Court of Appeals
FOR THE EIGHTH CIRCUIT
No. 96-2699
No. 96-2702

Bryan Kirby Barrett,                *
                                    *
                                    *
Appellee/Cross-Appellant,           * Appeals from the United
                                    * States
                                    * District Court for the
         v.                         * Southern District of Iowa.
                                    *
Gerardo Acevedo,                    *
                                    *

Appellant/Cross-Appellee.

_____

Submitted: April 17, 1997
Filed: May 5, 1998
_____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

Bryan Kirby Barrett has been twice tried for and convicted of two counts of murder, and the Supreme Court of Iowa has twice heard his appeals. After Barrett's first conviction, the court granted him a new trial. See State v. Barrett, 401 N.W.2d 184, 189 (Iowa 1987). At the second trial, Barrett was again convicted, and this time his conviction was affirmed by the Supreme Court of Iowa. See State v. Barrett, 445 N.W. 2d 749, 754 (Iowa 1989). Barrett then sought a writ of habeas corpus, pursuant

to 28 U.S.C. § 2254 (1994), from the federal district court, which granted the writ on the ground that the trial court erroneously admitted evidence in violation of Barrett's constitutional rights. The Attorney General of Iowa now appeals the granting of the writ and asserts that the evidence at issue was properly admitted. Barrett cross-appeals and contends that the Supreme Court of Iowa improperly relied on his reversed prior conviction in his second appeal.

We hold that the district court: (a) properly granted the writ of habeas corpus based on violation of Barrett's Sixth Amendment right of confrontation with respect to the hearsay testimony of the State's expert witness; (b) erroneously held that admitting Barrett's journal into evidence violated his rights under both the First Amendment and the Fifth Amendment; (c) properly ruled that The Antiterrorism and Effective Death Penalty Act of 1996 is inapplicable to this pending case; and (d) erroneously held that Barrett failed to exhaust his state remedies regarding his claim that the state court's reliance on his reversed prior conviction was improper, but hold that the issue is now moot.

On February 23, 1979, the bodies of two young women, Cynthia Kay Walker and Carol Ann Willits, were found several miles apart in rural Iowa. 401 N.W. 2d at 185. Walker was Barrett's girlfriend at the time of her death, and Barrett had previously had a romantic relationship with Willits. Walker had been shot three times and was found lying in the middle of a gravel road. Willits had been shot once through the right temple and was found seated behind the wheel of a car on a blacktop road. A note in Willits' handwriting was found in the car near her body. The note was addressed to Barrett and stated in part, "I'm sorry I've caused you so much trouble" and "I hope you find your peace/I found mine." Id. There was also a three-page postmarked letter in the car addressed to Willits from Barrett informing her that he did not reciprocate her romantic feelings for him. A valentine card in an envelope addressed to Barrett from Walker was also found in the car, in addition to strands of Walker's hair. Id.

According to Barrett, his former lover Willits had caught him in flagrante delicto with Walker. He surmised that Willits killed Walker and then committed suicide after discovering Barrett and Walker together.

The State did not charge Barrett with murder until 1984. The State alleged that Barrett murdered Walker to obtain life insurance proceeds from a policy for which she was the insured and he was the beneficiary. The State contended that Barrett also killed Willits and left false clues to give the impression that Willits murdered Walker and then committed suicide. Id.

Two journals written by Barrett were received into evidence at his first trial. One journal was undated, was thirteen or fourteen pages, and described, among other things, a scheme to kidnap and murder a newspaper carrier. Id. at 186. The other journal covered April through July 1977, was 143 pages, and described Barrett's feelings about a pending divorce and child custody dispute. It also discussed various schemes to harm or kill his wife and others. Id. at 185-86. At one point, the journal suggested that a reason for Barrett to kill his wife was for money. Although the journal did not mention life insurance, the State offered evidence at trial that Barrett had forged his wife's signature on an application for life insurance and obtained a policy for which he was the beneficiary two months before the first dated journal entry. Id. at 186. Barrett had not met either Walker or Willits when he wrote this journal, and they are not mentioned in the journal.

At Barrett's first trial, the jury found him guilty of two counts of first degree murder for the deaths of Willits and Walker. On appeal, the Supreme Court of Iowa held that the trial court erroneously admitted the shorter journal because it was used for the improper purpose of establishing Barrett's alleged propensity to commit the crimes. The court reversed and remanded for a new trial. Id. at 189.

At Barrett's second trial, Vincent DiMaio, a physician and forensic pathologist,

testified for the prosecution that Willits did not commit suicide but instead was murdered. 445 N.W.2d at 751. On redirect examination, Dr. DiMaio testified that it was common practice for forensic pathologists to discuss cases with colleagues when coming to a professional conclusion. He was then asked whether he "found any of your colleagues who has given you persuasive reason to disregard your opinion that this is a homicide as opposed to a suicide in the death of Carol Willits?" Id. Over Barrett's hearsay objection, DiMaio was allowed to respond and stated "No, sir."

Barrett was again convicted of the double murders, and the Supreme Court of Iowa affirmed the conviction. Barrett then sought a writ of habeas corpus from the federal district court and asserted that the state court erred in admitting the second longer journal, allowing DiMaio's hearsay testimony, refusing a change of venue, and relying on Barrett's overturned prior conviction. The district court granted the writ and held that the trial court erroneously admitted Barrett's journal and DiMaio's hearsay testimony. The State appeals the granting of the writ, and Barrett cross-appeals the issue of whether the Supreme Court of Iowa properly relied on his overturned prior conviction.

## I.

The Supreme Court of Iowa disapproved DiMaio's testimony about his colleagues' views on Willits's death, but nevertheless upheld Barrett's conviction because it found that the testimony did not affect the jury's finding of guilt. Id. at 754.[1]

_____

[1]In discussing the testimony, the Supreme Court of Iowa pointed to an earlier decision containing "indirect or obscured hearsay," as well as admission of opinion testimony, and stated that it was inclined to disapprove DiMaio's statement and "agree with defendant's challenge to the testimony." 445 N.W.2d at 751. Later in the opinion, when discussing whether the admission of DiMaio's statement was harmless error, the state supreme court referred to hearsay testimony and the countering of the defense's expert testimony "without producing [DiMaio's colleagues] for cross-examination." Id. at 754.

The federal district court, in considering Barrett's petition for a writ of habeas corpus, however, ruled that such testimony violated Barrett's Sixth Amendment right to confront his accusers and his Fourteenth Amendment right to due process.[2]  The State now argues that Barrett's Sixth Amendment challenge was procedurally defaulted and, on the merits, that DiMaio's testimony did not violate the confrontation clause of the Sixth Amendment.

We apply a de novo standard of review to the issue of whether Barrett has exhausted his state remedies. See Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Hankins v. Fulcomer, 941 F.2d 246, 249 (3d Cir. 1991).  As to the exhaustion requirement, it is well-settled that:

> If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.  If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

Duncan v. Henry, 115 S. Ct. 887, 888 (1995) (per curiam); see also Picard v. Connor, 404 U.S. 270, 275 (1971).  Accordingly, "[a] habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim."  Sloan v. Delo, 54 F.3d 1371, 1381 (8th Cir. 1995), cert. denied, 116 S. Ct. 728 (1996).  "If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default."  Id.

---

[2]The Sixth Amendment is applicable to the States through the Fourteenth Amendment.  See Pointer v. Texas, 380 U.S. 400, 403 (1965).

The petitioner must "fairly present" both the facts and the legal theory to the state court to satisfy the exhaustion requirement. "In this circuit, to satisfy the 'fairly presented' requirement, [petitioner] was required to 'refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent constitutional issue' in the . . . state court." Abdullah v. Groose, 75 F.3d 408, 411-12 (8th Cir.) (quoting Ashker v. Leapley, 5 F.3d 1178, 1179 (8th Cir. 1993)), cert. denied, 116 S. Ct. 1838 (1996).

In examining Barrett's briefing and the opinions of the state court, we must bear in mind that "[a]lthough the constitutional substance of a claim must be apparent, it is not necessary to cite 'book and verse on the federal constitution.'" Wyldes v. Hundley, 69 F.3d 247, 251 (8th Cir. 1995) (quoting Satter v. Leapley, 977 F.2d 1259, 1262 (8th Cir. 1992)), cert. denied, 116 S. Ct. 1578 (1996). It is the "substance" of his federal claim that must be fairly presented to the state court. See Anderson v. Harless, 459 U.S. 4, 6 (1982) (per curiam). In Barrett's state appellate brief, he argued that admitting DiMaio's testimony was error because DiMaio's corroborating colleagues were not subject to cross-examination.[3] In Barrett's state appellate reply brief, he repeated his complaint about lacking an opportunity for cross-examination and argued that if the court adopted the State's view, "the future of the right to confrontation, which is guaranteed by the Sixth Amendment of the United States Constitution . . . will be severely jeopardized and subject to abuse." Plainly, the gist of Barrett's complaint was

---

[3]With respect to DiMaio's testimony, Barrett's state appellate brief argues that "[s]uch corroboration evidence was safe from the test of cross-examination," and cites a case for the proposition that "admission of the hearsay opinions of others who were not subjected to cross-examination violated a defendant's right to a fair trial and resulted in prejudice." The brief further stated that "[DiMaio's] colleagues whose expertise, if any, was not disclosed were not subject to cross-examination. To condone the admission of such corroboration evidence would be to open the flood-gates of self-serving and self-corroborative testimony, insulated from the protections of cross-examination."

that he lacked the opportunity to cross-examine DiMaio's corroborating colleagues. The Supreme Court of Iowa framed his argument as being that "the State, by the challenged testimony, was able to counter his array of expert witnesses before the jury without producing them for cross-examination." 445 N.W.2d at 754. The dissent also referred to Barrett's lack of opportunity for cross-examination. See id. at 758 (Lavorato, J., dissenting).

After examining the record on this close issue, we conclude that Barrett fairly presented his Sixth Amendment claim to the state court and thus satisfied the exhaustion requirement. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend.VI. The essence of this guarantee is the opportunity for cross-examination. Indeed, "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 315-16 (1974)); see also Delaware v. Fensterer, 474 U.S. 15, 20 (1985) ("the Confrontation Clause guarantees an opportunity for effective cross-examination"). By repeatedly challenging his lack of opportunity for cross-examination, Barrett directed the state court's attention to his federal constitutional right to confront and cross-examine his accusers.[4]

---

[4]The fact that the confrontation clause and the opportunity for cross-examination are so intertwined distinguishes this case from Duncan v. Henry, 115 S. Ct. 887 (1995) (per curiam) and Ashker v. Leapley, 5 F.3d 1178 (8th Cir. 1993). In Duncan, the Court held that the petitioner did not exhaust his claim that he was denied due process because of an evidentiary error by arguing in state court that the evidentiary error was a "miscarriage of justice." 115 S. Ct. at 887-88. In Ashker, the court held that the petitioner did not exhaust his confrontation clause claim by arguing in state court that he was denied his constitutional right to a fair trial under the Fourteenth Amendment because of the introduction of hearsay evidence. 5 F.3d at 1179.

In Morrow v. Wyrick, 646 F.2d 1229 (8th Cir.), cert. denied, 454 U.S. 899 (1981), the court concluded that the confrontation claim had been fairly presented because, although petitioner's brief was "admittedly not a model of legal drafting . . ., [his] basic argument that the introduction of the challenged testimony deprived him of the right to confront and cross-examine witnesses is discernible." Id. at 1232; see also Hutchins v. Wainwright, 715 F.2d 512, 518-19 (11th Cir. 1983), cert. denied, 465 U.S. 1071 (1984) (holding that the petitioner fulfilled the exhaustion requirement with respect to his confrontation clause claim, even though he did not use the phrase "confrontation clause").

We conclude that the exhaustion requirement was fulfilled, and now turn to the merits of Barrett's confrontation clause claim. The issue of whether a defendant's Sixth Amendment right of confrontation was violated by hearsay evidence admitted at trial is a mixed question of fact and law that we review de novo. See Gochicoa v. Johnson, 118 F.3d 440, 445 (5th Cir. 1997); Swan v. Peterson, 6 F.3d 1373, 1379 (9th Cir. 1993), cert. denied, 513 U.S. 985 (1994).

As explained above, a defendant's right of cross-examination is essential to his Sixth Amendment right of confrontation:

> "[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination." Douglas v. Alabama, 380 U.S. 415, 418 (1965). The opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the factfinding process. Cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). Indeed, the Court has recognized that cross-examination is the "greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158 (1970).

Kentucky v. Stincer, 482 U.S. 730, 736 (1987) (emphasis added). The confrontation clause "has long been read as securing an adequate opportunity to cross-examine

adverse witnesses."  United States v. Owens, 484 U.S. 554, 557 (1988).

Not all hearsay,[5] however, violates a criminal defendant's constitutional rights. Hearsay evidence may be admitted if two requirements are met.  First, the prosecution normally must demonstrate that the declarant is unavailable.  See Ohio v. Roberts, 448 U.S. 56, 66 (1980).  Second, the  prosecution must establish that the hearsay statement bears "adequate indicia of reliability."  Id.  Where the hearsay does not fall within a firmly-rooted exception to the hearsay rule, as is the case here, the evidence must be excluded unless there is "a showing of particularized guarantees of trustworthiness." Id.  In determining whether this standard is met, the court examines all of the circumstances surrounding the statement at issue.  See Idaho v. Wright, 497 U.S. 805, 819 (1990).

There was no effort made at trial to satisfy either of these requirements.  There was no showing that DiMaio's colleagues were unavailable to testify at trial, and there was no evidence that the circumstances giving rise to DiMaio's colleagues' statements made such statements particularly trustworthy and reliable.  As the district court observed, "[t]here was nothing to support how Dr. DiMaio's colleagues reached their conclusions except for the bald statement of Dr. DiMaio himself."  The trial court erred in not requiring the State to fulfill these requirements before admitting the hearsay evidence.

Having concluded that the admission of this evidence was error, we must now determine whether such error was harmless.  If the error "had substantial and injurious effect or influence in determining the jury's verdict," it was not harmless. O'Neal v. McAninch, 115 S. Ct. 992, 994 (1995);  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  If, in the court's opinion, the issue is so evenly balanced that the court feels

---

[5]The State does not dispute that DiMaio's statement about his unidentified colleagues' opinions is hearsay.

itself "in virtual equipoise as to the harmlessness of the error," then it should not consider the error harmless but should grant the writ. O'Neal, 115 S. Ct. at 994.

DiMaio's hearsay statement was relevant to perhaps the most crucial issue at trial: whether Willits was murdered, as the State contends, or committed suicide, as Barrett asserts. The statement was made on redirect examination, after Barrett had presented his three expert witnesses, and was obviously intended to bolster DiMaio's opinion that Willits had been murdered. In effect, DiMaio was telling the jury, "All of my colleagues agree with me that she was murdered." Through these unidentified witnesses -- whether two or a dozen -- the State presented to the jury evidence damaging to Barrett on a crucial issue and bypassed the constitutional safeguards designed to test the reliability of evidence and bring the truth to light.

Without the opportunity to confront and cross-examine DiMaio's colleagues, Barrett was unable to examine and challenge their theories, assumptions, tests, qualifications, credibility, or any other factor relevant to the weight of this evidence. Barrett was deprived of the "opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Mattox v. United States, 156 U.S. 237, 242-43 (1895).

Of course, we cannot know how much weight the jury assigned to this evidence. But given the importance of this issue to the verdict, the importance of expert testimony to this issue, Barrett's complete lack of opportunity to confront and cross-examine these unidentified accusers, the State's failure to demonstrate that this evidence had any particularized guarantee of trustworthiness, we conclude that this error was not harmless. We note that both the district court and a dissenting judge of the Supreme Court of Iowa took the view that "such unchallenged opinions on a critical issue served to tip the scales in favor of the State in a case that was obviously close." 445 N.W.2d

at 758.

We hold that the admission of DiMaio's hearsay testimony violated Barrett's Sixth Amendment right of confrontation.

## II.

As explained above, Barrett wrote a 143-page journal that had its last entry dated July 1977, which was approximately two years before the deaths of Willits and Walker. In July 1977, Barrett inadvertently left this journal in a restaurant in Iowa City. 401 N.W.2d at 189-90. Restaurant employees found the journal and alerted the police because of the nature of the journal's entries. The police made a copy of the journal, although the original journal was returned to the restaurant and subsequently to Barrett. Id. at 190. The police provided a copy of the journal to agents of the Division of Criminal Investigation during the investigation of the two deaths. Prior to Barrett's first trial, the State subpoenaed the original journal from Barrett's counsel, and it was produced and admitted into evidence over Barrett's objection at trial. Id. On appeal, the Supreme Court of Iowa affirmed the admission of the journal and held that it was "relevant and material to some legitimate issue other than a general propensity to commit wrongful acts." Id. at 187. The court held that the journal entries, when considered with other evidence in the case, were "relevant as tending to dispel an innocent purpose for defendant's action in obtaining insurance on Walker's life." Id. at 188.

At Barrett's second trial, this journal was again admitted into evidence over his objection. On appeal, Barrett argued that evidence surrounding his purchase of life insurance on his wife, including his journal, was erroneously admitted because he did not purchase the insurance for a sinister purpose. Barrett contended that he obtained the insurance because his wife lost her job and therefore lost the life insurance provided by her employer. 445 N.W.2d at 752. The Supreme Court of Iowa held that Barrett's

explanation went to the weight of the insurance evidence and not its admissibility.

The federal district court held that admitting Barrett's journal into evidence violated his rights under both the First Amendment and the Fifth Amendment. We review the district court's legal conclusions de novo. See Hendrix v. Norris, 81 F.3d 805, 807 (8th Cir. 1996).

## A.

The district court held that under Fisher v. United States, 425 U.S. 391 (1976), Barrett had stated a legally-cognizable First Amendment claim. Fisher involved the IRS' summons to the taxpayers' attorneys to obtain tax-related work papers. Id. at 393-94. The Court upheld the seizure of the documents under the Fifth Amendment, as will be discussed below, but left open the possibility that more personal documents might find protection elsewhere, either in the Constitution, such as under the First or Fourth Amendments, or through an evidentiary privilege. Id. at 401.[6]

The State argues that to the extent that Fisher held that the First Amendment protects personal papers, only those documents raising freedom of association, and not freedom of speech, concerns are protected. The State emphasizes that the case cited by the Supreme Court in connection with the First Amendment, NAACP v. Alabama, 357 U.S. 449 (1958), involved the NAACP's membership list and its members' freedom of association, and did not raise freedom of speech issues.

---

[6]In a footnote, the Court further explained that "[s]pecial problems of privacy which might be presented by subpoena of a personal diary, United States v. Bennett, 409 F.2d 888, 897 (CA2 1969) (Friendly, J.), are not involved here." 425 U.S. at 401 n.7. The Bennett case involved a Fourth Amendment challenge to seizing a letter but did not address the implications of the First Amendment. See 409 F.2d at 896-97.

Public disclosure of membership identities may, in some circumstances, pose a very real threat to freedom of association. Accordingly, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." Id. at 462. This case, however, is based upon Barrett's privacy and speech interests in his journal, and he does not contend that publicly disclosing his journal will chill his right to freely associate.

We need not, and do not, decide whether Fisher's suggestion that the First Amendment may protect certain private papers applies not only to papers implicating freedom of association interests, but also to those implicating freedom of speech interests. Even assuming that the First Amendment does protect private papers raising certain types of speech interests, we do not believe that Barrett's journal is the type of speech that would, or should, be constitutionally protected. The risk that Barrett's speech would be curtailed through public disclosure was created by Barrett himself when he left his journal in a public place. In fact, one type of harm that could arise from public disclosure -- that Barrett would stop making entries in his journal because he no longer felt free to express himself -- may have already occurred since he ceased writing in this journal soon after the police discovered it. But it was Barrett's own action, and not government action, that caused such speech to cease. See United States v. Apker, 705 F.2d 293, 305 (8th Cir. 1983), cert. denied, 465 U.S. 1005 (1984).[7]

Moreover, we believe that more recent Supreme Court cases reflect less willingness to recognize First Amendment interests in criminal cases. In Wisconsin v.

---

[7]In United States v. Apker, we rejected a First Amendment challenge to a warrant seeking, among other things, disclosure of the membership list of a Hell's Angels group. We noted that the group members publicly identified themselves as Hell's Angels by their dress; therefore, any additional harm from disclosing their membership list was unlikely. 705 F.2d at 305. Similarly, here, it is Barrett whom publicly disclosed his speech, not the government.

Mitchell, 113 S. Ct. 2194 (1993), the Court, in a unanimous opinion, upheld a state statute that enhanced the defendant's sentence for aggravated battery and theft because he intentionally selected his victim because of his victim's race. While enhancing a sentence merely because the government does not agree with a defendant's beliefs would violate the Constitution, the statute permissibly "single[d] out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and societal harm." Id. at 2201. The Court also held that:

> The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.

Id. at 2201 (citing Haupt v. United States, 330 U.S. 631 (1947));[8] see also Dawson v. Delaware, 503 U.S. 159, 165 (1992) ("[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First

---

[8]Barrett argues that Wisconsin v. Mitchell's ruling is limited to post-trial sentencing and does not apply to trials. As the quoted language shows, however, the Court observed that such evidence could be used for trial purposes also. Moreover, we have relied upon Wisconsin v. Mitchell for this proposition in subsequent cases. See, e.g., Richenberg v. Perry, 97 F.3d 256, 263 (8th Cir. 1996) (First Amendment not violated by using service member's declaration of homosexuality as evidence of engaging in conduct inconsistent with military activity); United States v. Dunnaway, 88 F.3d 617, 618-19 (8th Cir. 1996) (First Amendment not violated by admitting evidence of defendant's racist views, behavior, and speech to prove discriminatory purpose and intent, an element of the crime); United States v. Dinwiddie, 76 F.3d 913, 926 n.10 (8th Cir. 1996) (First Amendment would be violated by punishing defendant for expressing her view on abortion, but it was not violated by using her statements as evidence of intimidation with threats of force).

-14-

Amendment").

We conclude that the State did not violate Barrett's First Amendment right when it obtained his journal by subpoena duces tecum, and we reverse the district court on this issue.

**B.**

The district court held that the State's subpoena duces tecum served on Barrett's counsel compelling production of Barrett's journal violated Barrett's Fifth Amendment privilege against self-incrimination.[9]  On appeal, the State argues that neither the contents of the journal, nor Barrett's actions in producing it, are protected by the Fifth Amendment, and that the holding of Boyd v. United States, 116 U.S. 616 (1886), which protects personal papers under the Fifth Amendment, has been eroded by later decisions.  Barrett argues that the Fifth Amendment protects both the contents of his journal and his actions in producing it.

More than 100 years ago, in Boyd v. United States, the Court broadly declared that there was no difference between compelling a witness to testify against himself and using a person's private papers against him.  116 U.S. at 633.  The Fifth Amendment protects both "security of person and property."  Id. at 635.  Over time, however, the

---

[9]To the extent the Fifth Amendment shielded the journal from compulsory production, that production was not lost by Barrett transferring it to his counsel. "When material has been transferred from a client to an attorney for the purpose of seeking legal advice and the subpoena is directed to the attorney, the proper inquiry is whether the subpoena, if directed to the client himself, would require compelled testimonial self-incrimination." In re Grand Jury Proceedings, Subpoenas for Documents, 41 F.3d 377, 379 (8th Cir. 1994); see also Fisher, 425 U.S. at 404 (if the client is privileged from production of the documents, the attorney in possession of the documents is also privileged).

Supreme Court has narrowed the Fifth Amendment's scope of protection for documents, although it has declined to expressly eliminate that protection. "[T]he Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a testimonial communication that is incriminating." Fisher, 425 U.S. at 408. If the document was voluntarily created, it is not compelled testimonial evidence. "The fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege. And, unless the Government has compelled the subpoenaed person to write the document, the fact that it was written by him is not controlling with respect to the Fifth Amendment issue." Id. at 410 n.11 (citations omitted).

Apart from the contents of the documents, however, the act of producing the documents may constitute compulsory incriminating testimony which is itself forbidden by the Fifth Amendment. "The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [defendant]." Id. at 410.

Applying these principles in Fisher, the Court held that the contents of the tax papers at issue were not protected by the Fifth Amendment because they had been voluntarily created prior to the subpoena and therefore the taxpayers had not been compelled to testify against themselves by creating the documents. As to the taxpayers' action in producing the documents, the Court also held that the Fifth Amendment was not violated because the government was not relying on the taxpayers' acts of production to establish the existence or location of the documents, nor to authenticate them, because they had been prepared by an accountant.

In Fisher, the Court expressly declined to decide whether the case would have

a different result if the documents were "private papers" in the possession of the taxpayer. "Whether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his 'private papers.'" Id. at 414.

In United States v. Doe, 465 U.S. 605 (1984), the Court applied the Fisher analysis to business records in the possession of a sole proprietor and held that the records' contents were not protected by the Fifth Amendment because the records were voluntarily created. Id. at 611-12. Unlike in Fisher, however, the district court had made a finding that the act of production would involve testimonial self-incrimination. Because that finding rested primarily on factual issues, the Court declined to overturn it. Id. at 613-14.

Given this precedent, we are faced here with two issues regarding the Fifth Amendment and production of Barrett's journal: (a) does the Fifth Amendment protect the contents of the journal; and (b) does Barrett's production of the journal have communicative aspects, apart from the contents, which are protected by the Fifth Amendment?

Since Fisher, circuit courts have split on whether its rationale extends to private papers, and not just business records, such that there is no Fifth Amendment protection for the contents of any document that was not created under compulsion. The majority view appears to be that the Fifth Amendment does not protect the contents of voluntarily prepared documents, whether business or personal,[10] although several

---

[10]See, e.g., United States v. Grable, 98 F.3d 251, 253 (6th Cir. 1996), cert. denied, 117 S. Ct. 691 (1997); In re Grand Jury Subpoena Duces Tecum dated Oct. 29, 1992, 1 F.3d 87, 93 (2d Cir. 1993), cert. denied, 510 U.S. 1091 (1994); United States v. Wujkowski, 929 F.2d 981, 983 (4th Cir. 1991), cert. denied, 507 U.S. 1029 (1993); In re Sealed Case, 877 F.2d 83, 84 (D.C. Cir. 1989), cert. denied, 493 U.S. 1044 (1990); In re Grand Jury Proceedings on Feb. 4, 1982, 759 F.2d 1418, 1419 (9th Cir. 1985).

circuits have held that the contents of personal papers remain privileged in certain circumstances.[11]

In Eighth Circuit cases involving business records, we have acknowledged that the Fifth Amendment's "protection does not apply to the contents of any document that a person has voluntarily prepared." In re Grand Jury Witnesses, 92 F.3d 710, 712 (8th Cir. 1996); see also Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 317 (8th Cir. 1993). In United States v. Mason, 869 F.2d 414, 416 (8th Cir.), cert. denied, 492 U.S. 907 (1989), however, we expressly avoided deciding whether personal papers receive more Fifth Amendment protection than business records, but declared that such protection, if any, would be available only for the most personal types of documents. "[I]f contents are protected at all, it is only in rare situations, where compelled disclosure would break 'the heart of our sense of privacy.'" Id. at 416 (quoting Butcher v. Bailey, 753 F.2d 465, 469 (6th Cir. 1985)).

In In re Grand Jury Proceedings, Subpoenas for Documents, 41 F.3d 377 (8th Cir. 1994), we addressed the issue, at least in part, by ruling that the contents of the taxpayers' private papers were not protected by the Fifth Amendment because they were voluntarily created. Id. at 379-80. The subpoenaed documents included business records, but also included documents of a more private nature, such as letters and journals, related to certain financial transactions. Id. at 378.

The case before us presents a more difficult Fifth Amendment issue than in In re Grand Jury Proceedings, Subpoenas for Documents because the document here, a personal journal, is more intimate and private than the documents subpoenaed in that

---

[11]See, e.g., In re Grand Jury Proceedings, 55 F.3d 1012, 1013-14 (5th Cir. 1995) (per curiam);In re Grand Jury Proceedings, 632 F.2d 1033, 1043 (3d Cir. 1980).

case. Despite the personal nature of this journal, however, we conclude that the Fifth Amendment does not protect its contents from compelled disclosure because the focus of the Fifth Amendment is compulsory self-incrimination, not privacy. In Fisher, the Court declared that the Fifth Amendment does not provide "a general protection of privacy but [deals] with the more specific issue of compelled self-incrimination." 425 U.S. at 400. The Court emphasized that it had "never on any ground, personal privacy included, applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which, in the Court's view, did not involve compelled testimonial self-incrimination of some sort." Id. at 399. The Court concluded that:

> We cannot cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy -- a word not mentioned in its text and a concept directly addressed in the Fourth Amendment. We adhere to the view that the Fifth Amendment protects against "compelled self-incrimination, not [the disclosure of] private information."

Id. at 401 (emphasis added) (quoting United States v. Nobles, 422 U.S. 225, 233 n.7 (1975)).[12]

We hold that the Fifth Amendment does not protect the contents of Barrett's journal because he voluntarily created it; therefore, it was not compelled self-incrimination. We turn now to whether Barrett's Fifth Amendment right was violated by the act of production.

---

[12]Justice O'Connor wrote in her Doe concurrence "that the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind." 465 U.S. at 618 (O'Connor, J., concurring). This concurrence has now been favorably cited by the Supreme Court in another case, thus indicating that Justice O'Connor may now represent the majority view. See Baltimore City Dep't of Social Serv. v. Bouknight, 493 U.S. 549, 555 (1990).

As explained above, the act of producing a document may have communicative aspects of its own, apart from its contents.  Specifically, by producing the document, the criminal defendant may be admitting that the document exists, that he has possession of or control over the document, and that the document is authentic.  See Fisher, 425 U.S. at 410.  For example, in In re Grand Jury Proceedings, the court held that the act of production would violate the taxpayer's Fifth Amendment privilege because such action would "implicitly vouch for the genuineness of the documents," 41 F.3d at 380, and the broad language of the subpoena "would require the witness to discriminate among documents, thereby providing identifying information that is relevant to the authenticity of the documents."  Id. at 381.

In this case, however, we believe that existence, possession, and authenticity are a "foregone conclusion," 425 U.S. at 411, because of the events following Barrett's leaving the journal in a restaurant, which took place two years before the deaths of Willits and Walker.  After the journal was turned over to the police and copied, Barrett made oral statements to the police admitting that the journal was his.  At trial, Sergeant Ronald Fort identified and authenticated the journal as Barrett's.  We acknowledge that whether the act of production involves self-incrimination is a primarily factual issue, and that we should not overturn a finding of self-incrimination unless it has no support in the record.[13]   Doe, 465 U.S. at 614.

We are also cognizant, however, that the defendant must be "confronted by substantial and 'real,' not merely trifling or imaginary, hazards of incrimination."  Doe, 465 U.S. at 614 n.13 (quoting Marchetti v. United States, 390 U.S. 39, 53 (1968)).  Given that the State already had a copy of the journal in its possession and that Barrett had admitted ownership and authorship, we believe that there is no support in the

---

[13]It is not clear from the district court's opinion, however, whether the finding of compulsory self-incrimination relates to both contents and act of production, or only to contents.

record for concluding that Barrett, by the act of producing the journal, incriminated himself. In sum, Barrett's act of producing the journal "add[ed] little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." Fisher, 425 U.S. at 411; see, e.g., United States v. Rue, 819 F.2d 1488, 1493-94 (8th Cir. 1987). (Fifth Amendment not violated where taxpayer admitted the existence and his possession of the records and the IRS could authenticate the records independently without reference to the act of producing).

We reverse the district court's holding that Barrett's Fifth Amendment privilege against self-incrimination was violated by his compelled production of the journal.

**III.**

The parties dispute the applicability of a provision of The Antiterrorism and Effective Death Penalty Act of 1996 to Barrett's habeas petition. The State contends that the Act's amended standard for granting habeas relief applies here, see 28 U.S.C. § 2254(d)(1), while Barrett takes an opposing view. In the district court's order certifying probable cause for appeal, the court held that the Act did not apply to this pending case. We review the court's legal conclusion de novo. Hendrix, 81 F.3d at 807.

The Act was signed into law on April 24, 1996 and, among other things, it: (1) amended certain sections of chapter 153 of Title 28 of the United States Code, which govern all federal habeas corpus proceedings; and (2) created a new chapter 154 which applies only to habeas proceedings in capital cases. As to capital cases, the Act expressly provides that "[c]hapter 154 . . . shall apply to cases pending on or after the date of enactment of this Act." Pub. L. No. 104-132, § 107(c), 110 Stat. 1226 (1996) In contrast, the Act is silent as to whether the amendments to chapter 153 apply to pending cases.

We may summarily dispose of this issue because the Supreme Court has recently resolved it. In <u>Lindh v. Murphy</u>, 117 S. Ct. 2059 (1997), the Court addressed the issue of "whether that new section of the statute dealing with petitions for habeas corpus governs applications in noncapital cases that were already pending when the Act was passed." <u>Id.</u> at 2061. The Court concluded that amended 28 U.S.C. § 2254(d) does not apply to pending cases, emphasizing Congress' express statement in the Act that new chapter 154 shall apply to pending cases, in contrast with congressional silence as to the applicability of amended chapter 153 to pending cases. The Court read this "as indicating implicitly that the amendments to chapter 153 were assumed and meant to apply to the general run of habeas cases only when those cases had been filed after the date of the Act." <u>Id.</u> at 2063. The Court reasoned that "[n]othing . . . but a different intent explains the different treatment." <u>Id.</u> at 2064. The difference between the two chapters "illustrates the familiar rule that negative implications raised by disparate provisions are strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted." <u>Id.</u> at 2065.

Based on the Supreme Court's decision in <u>Lindh</u>, and the fact that Barrett's habeas petition was filed on February 5, 1991, we conclude that 28 U.S.C. § 2254(d), as amended by the Act, does not apply to Barrett's pending habeas corpus petition. Accordingly, we cannot apply the amended standard to Barrett's habeas petition and need not address Barrett's argument that the Act is unconstitutional.

## IV.

In the final issue on appeal, we consider a statement made by the Supreme Court of Iowa in Barrett's appeal after his second trial. The court addressed Barrett's claim that Dr. DiMaio's hearsay testimony unfairly deprived him of his right of cross-examination and ruled that the statement did not affect the jury's verdict. 445 N.W.2d at 754. The court based its conclusion, at least in part, on Barrett's reversed prior

conviction: "This was a second trial. Two juries have unanimously agreed on defendant's guilt. That fact is of some significance in evaluating the possibility of prejudice." Id.

Barrett then filed a petition for rehearing with the Supreme Court of Iowa on the basis that the court's reference to his reversed prior conviction violated his right to due process. The petition for rehearing was denied, and Barrett then filed his petition for habeas relief.

The federal district court strongly believed that the Supreme Court of Iowa's reference to Barrett's reversed conviction was constitutional error:

> [T]he Iowa Supreme Court's rationale was faulty when it used the first but later reversed verdict to bolster the second one, which was, itself, a 14th Amendment Due Process violation. The first verdict was reversed due to an evidentiary violation, and how or why the first jury voted should have been given no weight, since that jury had considered inadmissible evidence.

Despite this strong belief, however, the district court did not rule in Barrett's favor because it concluded that Barrett had failed to fairly present the constitutional issue to the state court and therefore the issue was not exhausted.[14]

We reverse on the exhaustion issue because Barrett, by raising the constitutional violation in his petition for rehearing to the Supreme Court of Iowa, fairly presented his claim. Obviously this was his first opportunity to raise the issue in state court because the alleged constitutional error did not occur until the Supreme Court of Iowa ruled. We believe that raising the issue at that point was sufficient. See II J. Liebman & R.

---

[14]As stated earlier, we review de novo the issue of exhaustion of state remedies. Tower v. Phillips, 7 F.3d at 210.

Hertz, <u>Federal Habeas Corpus Practice and Procedure</u> § 23.3b, at 669 (2d ed. 1994) ("If the petitioner fails to raise a federal claim at trial (or if the claim was not cognizable at or did not arise until after trial), the petitioner satisfies the exhaustion requirement by raising the claim . . . on a motion for rehearing of the appeal."); <u>see also</u> <u>Herndon v. Georgia</u>, 295 U.S. 441, 444 (1935) ("There is no doubt that the federal claim was timely if the ruling of the state court could not have been anticipated and a petition for rehearing presented the first opportunity for raising it."). Because raising the issue in his petition for rehearing,[15] gave the Supreme Court of Iowa the opportunity to correct any alleged errors, the purpose for the exhaustion requirement was fulfilled. <u>See Picard</u>, 404 U.S. at 275. The fact that the court exercised its discretion not to address the issue is of no consequence.

We decline, however, to devote lengthy discussion to the merits of this issue because it is moot. Based on our decision today, Barrett will either be released or retried, and the language in the Supreme Court of Iowa's decision regarding his reversed prior conviction has no further impact. In the event his case ends up before the Supreme Court of Iowa again, we are confident that the court will render its decision without reference to or reliance on Barrett's reversed prior convictions.[16]

---

[15]Pursuant to the Iowa Rules of Appellate Procedure, a petition for rehearing "shall state with particularity the points of law or fact which in the opinion of the petitioner the supreme court has overlooked or misapprehended." Iowa R. App. P. 27(a).

[16]"[I]t is quite clear, that the order granting the new trial has the effect of vacating the former judgment, and to render it null and void, and the parties are left in the same situation as if no trial had ever taken place in the cause. This is the legal effect of the new trial by a court competent to grant it." <u>United States v. Ayres</u>, 76 U.S. (9 Wall.) 608, 610 (1869); <u>see</u> <u>Robinson v. Leapley</u>, 26 F.3d 826, 829-30 (8th Cir. 1994) ("under the clean slate doctrine, when a defendant's conviction is reversed for trial error, the conviction and sentence imposed pursuant to the conviction are nullified").

In conclusion, we affirm the federal district court's grant of a writ of habeas corpus to Barrett on the basis that his Sixth Amendment right of confrontation and cross-examination was violated by Dr. DiMaio's hearsay testimony in his second trial. Further, we rule that the admission of Barrett's journal did not violate either his First Amendment or Fifth Amendment rights.[17]   Finally, we conclude that amended 28 U.S.C. § 2254(d) does not apply to Barrett's habeas petition.

BEAM, Circuit Judge, concurring and dissenting.

I dissent from the holding in Part I of the court's opinion and from a result that will return this case to the state court for a third trial, or, in the alternative, for Barrett's release.

In the state court proceeding that we review, the Iowa Supreme Court said "[t]his was a second trial.  Two juries have unanimously agreed on defendant's guilt . . . . Defendant was superbly represented at trial and on appeal.  He received a fair, if not absolutely perfect, trial.  He is not entitled to a third one."  State v. Barrett, 445 N.W.2d 749, 754 (Iowa 1989).  I agree.

First, my review of the Iowa Supreme Court's decision reveals no explicit holding that Dr. DiMaio's testimony was improper hearsay.  Although the Iowa Supreme Court stated that it was "inclined to disapprove" the testimony, it expressly

---

[17]We do not address the issue of whether the journal in its entirety is admissible or whether parts are inadmissible based on lack of relevance or other evidentiary principles.  The Supreme Court of Iowa found the journal relevant to whether Barrett had "an innocent purpose for . . . obtaining life insurance on Walker's life."  401 N.W.2d at 188.  We observe, however, that both that court and the federal district court expressed concern about the prejudice resulting from admitting statements from the journal concerning issues other than Barrett's alleged profit motive for the crimes.  Id.

deferred considering whether the statement "amounted to abuse requiring reversal." Id. at 751. The discussion centered around whether there was foundation for the statement as part of the basis for the expert's opinion. See id at 752. The only intimation that the Court regarded the statement as hearsay is that it discussed the hearsay rule in connection with its harmless error analysis. See id. at 751. My reading is that the Iowa Supreme Court stopped short of finding that the statement was hearsay, but determined that even if the statement amounted to hearsay, its admission would nonetheless amount to harmless error.

If the Iowa Supreme Court had made an explicit finding on the issue, we would arguably be bound by that evidentiary ruling. See Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994). But where, as here, there has been no definite ruling on whether the statement in fact amounts to hearsay, this court is free to revisit the evidentiary matter for purposes of our Confrontation Clause and harmless error analyses. This is also likely true even with an explicit evidentiary ruling since we deal with a federal constitutional issue in a federal habeas corpus action. Proceeding accordingly, it is clear to me that we should reverse the district court and remand for dismissal of Barrett's petition.

Since the evidentiary question will influence the issue of harmless error, I begin with the admissibility analysis. First, I do not believe that the statement in question is hearsay. Under both the Federal Rules of Evidence and the Iowa Rules of Evidence, hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Iowa R. Evid. 801(c); Fed. R. Evid. 801(c). Therefore, by definition, an out-of-court statement is not hearsay if it is not offered to prove the facts asserted. See Roberts v. Newville, 554 N.W.2d 298, 300 (Iowa Ct. App. 1996). A common type of statement which falls outside the hearsay definition because it is not offered for its truth is one offered to show effect on the recipient of the statement. See id. Thus, an out-of-court statement which is offered to reveal the recipient's state of mind is not inadmissible hearsay. See id.

In this case, the evidentiary value of the statements made to Dr. DiMaio was not their truth, but rather their effect on Dr. DiMaio. Dr. DiMaio did not, as Barrett claims, recite opinions of his colleagues without providing Barrett the opportunity to confront and cross-examine the individuals. Indeed, after stating that it is common practice in forensic medicine to discuss findings and conclusions with associates, Dr. DiMaio was asked if any of his colleagues "[had] given [him] persuasive reason to disregard [DiMaio's] opinion." Jt. App. Vol. I at 87. In other words, after these discussions, what was Dr. DiMaio's state of mind?

An examination of the testimony in context shows that it was intended to reveal Dr. DiMaio's state of mind. In his examination of the witness, Barrett's counsel opened the door to this line of inquiry with the following colloquy:

> Q. Does it matter to you today that you know that information that I've just given to you?
> A. No, sir, because I told you my opinion's that is [sic] homicide based upon the multiple factors involved.
> Q. You don't want to add that one factor in and change your opinion, do you?
> A. I've already taken that into account, but what I'm saying is -- I've taken it into account. There is a scarf on the backseat, but it doesn't mean any thing. What I'm saying is I've gone over the autopsy, I've gone over the scene photos, I've gone over all the materials supplied to me, and based on that, it's my opinion it's a homicide, and I listed the reasons why.
> Q. And you reached that judgment on the 29th day of November and you haven't changed it, have you?
> A. Nothing has been presented to me since then to change the opinion.
> Q. Then you're not about to. You're 99 percent right and you're not about to change your opinion, are you, Doc?
> A. I change my opinions when you present material to me to show that I am wrong and then I'll change my opinion.

Jt. App. Vol. I at 82-83. This exchange was apparently pursued to show Dr. DiMaio's reluctance to change his original opinion based on evidence that he might not have known when he formed the opinion.[18] The prosecution countered by eliciting testimony, including the purported hearsay statement, that related to whether Dr. DiMaio regarded himself as "so inflexible or dogmatic that [he] would never change [his] opinion if presented with contrary evidence?" Jt. App. Vol. I at 83. The evidence clearly related to Dr. DiMaio's state of mind and not to the truth of whatever the unexpressed, supposed-hearsay statements would reveal. Accordingly, the answer did not constitute hearsay at all and, thus, did not trigger a Sixth Amendment confrontation issue.[19]

Most importantly, I agree with the Iowa Supreme Court that, even if the statement were hearsay and it violated the Confrontation Clause, any error was harmless. See Harrington v. Iowa, 109 F.3d 1275, 1279 (8th Cir. 1997) (holding that a violation of the Confrontation Clause can constitute harmless error). In habeas, the more deferential harmless error standard of Brecht v. Abrahamson, 507 U.S. 619 (1993) (substantial or injurious effect or influence on the jury's verdict) is applied to constitutional errors considered by state courts, but the strict standard set out in

_____

[18]Barrett's attorney suggested that Willits had once told a roommate that if she ever killed herself she would use a blindfold. Jt. App. Vol. I at 81. As discussed infra, one of the factors that Dr. DiMaio relied on in forming his opinion was the fact that use of a blindfold in a suicide was, in his experience, rare. The jury was allowed to, and did, consider this "new evidence" in evaluating Dr. DiMaio's credibility

[19]Even if the statement were regarded as hearsay, I would find that it does not violate the Confrontation Clause. The Confrontation Clause and the hearsay rule are not coextensive. See Ohio v. Roberts, 448 U.S. 56, 62-65 (1980). Although both protect similar values, each sets independent prohibitions on admissibility. See id. A Confrontation Clause violation necessarily envisions an absent declarant whose statement is to be used against the defendant. As discussed above, no statement about which to confront an absent declarant was ever admitted.

<u>Chapman v. California</u>, 386 U.S. 18 (1967) (harmless beyond a reasonable doubt) is used where the state court has not applied the <u>Chapman</u> analysis in the first instance. <u>See</u> <u>Joubert v. Hopkins</u>, 75 F.3d 1232, 1245 (8th Cir.), <u>cert. denied</u>, 116 S. Ct. 2574 (1996).  Although the Iowa Supreme Court conducted harmless error review on the hearsay issue, it is not clear that it reviewed Barrett's claim for harmless <u>constitutional</u> error, applying the <u>Chapman</u> standard.  It is not necessary to decide which standard applies here, however, because even under the stringent standard, I would find the admission of  the statement harmless "beyond a reasonable doubt."[20]

Contrary to what the court states, this was not, in my view, a close case.  The prosecution had assembled a solid case based on compelling circumstantial evidence. Barrett had purchased a $50,000 life insurance policy on the deceased Cynthia Walker. The policy contained a double indemnity clause in case of nonnatural death.  The state offered evidence that Carol Willits purchased the murder (and ostensible suicide) weapon at Barrett's request.  The state further presented evidence that a car with rectangular headlights, similar to Barrett's parents' Buick, had been seen on the road

---

[20]Oddly, the court today applies the <u>Brecht</u> standard, as modified by <u>O'Neal v. McAninch</u>, 513 U.S. 432 (1995), instead of the more stringent "beyond a reasonable doubt" <u>Chapman</u> standard.  The court would have had an easier time justifying its decision to afford little deference to the state court's harmless error finding under <u>Chapman</u> than under <u>Brecht</u>.  The <u>Brecht</u> standard, rooted in concerns of comity, requires more deference to state court findings than the court today affords it.  <u>See</u> <u>Brecht</u>, 507 U.S. at 635-36. This controversy, however, is of little import to my discussion, except that it further dilutes the court's opinion.   Further, <u>O'Neal</u> only modifies <u>Brecht</u> in the in the "unusual" and "narrow circumstance" where we entertain "grave doubt" about whether trial constitutional error had a substantial and injurious effect or influence in determining the jury's verdict.  <u>O'Neal</u>, 513 U.S. at 437.  "Grave doubt" means that the matter is so evenly balanced that a judge feels himself in virtual equipoise as to the harmlessness of the error.  <u>See</u> <u>id.</u>  This is not such a case.  My review of the record here produces no doubts, much less grave doubts.  As noted <u>infra</u>, the evidence in this case on harmlessness is not in virtual equipoise, but is weighted firmly in favor of the verdict.

where Walker died. There was also evidence that the blindfold used on Carol Willits was made of fabric similar to that found in pillowcases in Barrett's parents' home.

Although the court characterizes this case as a "battle of the experts," with Dr. DiMaio's testimony being pivotal, my review of the record shows it was much more than that. The most damaging evidence, the admission of which the court affirms today, was contained in Barrett's earlier journal. The 143-page handwritten journal details numerous plans and schemes to kill or maim his ex-wife, including plans to burn her face with acid. The journal is replete with drawings, diagrams and sketches of his sinister designs. In the journal, Barrett repeatedly refers to his need to get rid of his ex-wife. The state also showed that, contemporaneously with the inception of the journal, Barrett had forged his ex-wife's signature on an application for life insurance. This evidence tended to negate Barrett's innocent explanation for his later purchase of insurance on the life of his then-girlfriend, Cynthia Walker. It is hard for me to imagine that the somewhat dry testimony of experts would overwhelm a jury in the face of such compelling evidence. In short, a reasonable juror would find the journal a persuasive reason to believe that the deaths were murders, committed by Barrett, separate and apart from what the experts testified.

The expert testimony is similarly availing to the prosecution. The prosecution presented Dr. DiMaio, who testified that, in his opinion, Carol Willits's death was a homicide. He based his decision on six factors: 1) the presence of a blindfold, which he found highly unusual in a suicide; 2) the fact that the knot on the blindfold was tied on the left by a right-handed person; 3) the fact that she was wearing large cotton work gloves, which would have made it difficult for her to tie the knot and which would have become bunched in the trigger of the gun; 4) the fact that Willits's hand was found in her lap with the gun on top of her hand when the recoil of the gun should have sent the hand and the gun to the right; 5) the straight path of the bullet when in most suicides the path of the bullet is at an angle; and 6) the fact that there was an intact paper bag on the seat which should have been flattened by the gun. He emphasized that each of

these factors, standing alone, could be discredited, but that his opinion was based on the presence of all six factors. Dr. DiMaio was skillfully cross-examined by Barrett's counsel, who brought out the fact that Dr. DiMaio had formed his opinion on the first day he was contacted by authorities.

Three other expert witnesses testified that the death was a suicide. Each of these experts discredited the factors that Dr. DiMaio relied on in forming his opinion. Although each factor was discredited singly, there was no refutation of the fact that the factors in combination pointed to homicide. I find that Dr. DiMaio's testimony is simply more persuasive, that is, it just makes more sense, than the testimony of the other experts. I have no difficulty finding that the jury believed Dr. DiMaio over the others, without regard to any asserted bolstering of his testimony by unnamed supporters. I have reviewed the record of this case and, under the circumstances, I would find any error to be harmless beyond a reasonable doubt.

In conclusion, while I concur in Parts II, III and IV of the opinion, I believe that the court has found a very thin reed on which to support the habeas corpus release of a state prisoner fairly convicted in state court. I respectfully dissent to the result reached in Part I.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.